**********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner DeLuca and the briefs and arguments of the parties. The appealing party has shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission modified the Opinion and Award of Deputy Commissioner DeLuca by allowing restitution, civil penalties, and attorneys' fees.
 ********** RULING ON EVIDENTIARY MATTER
On February 14, 2007, defendants filed a Motion to Reopen the Record to Submit Newly Discovered Evidence. In particular, defendants requested an Order reopening the record and allowing the admission of corporate evidence filed with the North Carolina Department of Secretary of State discovered after the record was closed. Plaintiff did not file a Response to the *Page 2 
Motion. Defendants' Motion was held in abeyance until consideration by the Full Commission at the hearing of this matter.
Based on a careful review of defendants' Motion and the Industrial Commission records in this matter, it is HEREBY ORDERED that defendants' Motion is GRANTED.
 **********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of the parties.
3. An employer-employee relationship existed between plaintiff and defendant-employer.
4. Defendant-employer is insured by North American Specialty Insurance and its claims are administered by Claims Control, Inc.
5. Plaintiff suffered an injury by accident on January 10, 2001 when a step broke as he was ascending stairs to his truck, causing him to fall.
6. Plaintiff's claim was accepted as compensable and, initially, plaintiff received $253.36 in temporary total disability benefits based upon an average weekly wage of $380.02 beginning on January 11, 2001. *Page 3 
7. Subsequently, the parties stipulated to an average weekly wage of $493.33, yielding a compensation rate of $328.90 and an amended Form 60 was completed on January 29, 2003, with the amount of underpayment being forwarded to plaintiff at that time.
8. On November 21, 2003, plaintiff executed a settlement agreement for which he was to receive a total of $100,000.00 based upon his contention that he was permanently and totally disabled as a result of his work injury.
9. On December 2, 2003, an Order was entered approving the Compromise Settlement Agreement.
10. On December 19, 2003, defendants filed a Motion to Set Aside the Order Approving Settlement and Motion for Stay of Payment with Executive Secretary Weaver.
11. On the same date defendants filed a Form 24 Application to Terminate Benefits and Motion for Administrative Imposition of Civil Penalties and Costs.
12. On January 12, 2004, Executive Secretary Weaver filed a memorandum stating that she had referred the Form 24 Application for a formal hearing and stating that the issue of setting aside the agreement must also be determined after an evidentiary hearing.
13. On February 5, 2004, Executive Secretary Weaver filed an Order allowing Amy S. Berry to withdraw as counsel for plaintiff.
14. On February 23, 2004, defendants filed a Supplement to the Form 24 Application to Terminate Benefits based upon plaintiff's failure to execute a Form 90 forwarded to him on December 18, 2003.
15. On April 6, 2004, Deputy Commissioner Bradley W. Houser entered an Order allowing a continuance of the April 12, 2004 hearing based upon plaintiff's request for time to obtain legal counsel. *Page 4 
16. On July 28, 2004, Deputy Commissioner DeLuca granted plaintiff a continuance based upon his request for additional time to obtain legal counsel.
17. The following stipulated documents were entered into the record:
 a. Pretrial Agreement (Stipulated Exhibit 1);
 b. Medical records (Stipulated Exhibit 2);
 c. Workers' compensation forms and filings (Stipulated Exhibit 3); and
 d. Documentation concerning alleged fraud (Stipulated Exhibit 4).
 **********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on May 16, 1945. Most of his experience has been in the trucking industry. In January 2001, he worked for defendant-employer as a truck driver. Plaintiff was injured on January 10, 2001, when he fell after the step of his truck broke.
2. Plaintiff was initially treated at Doctor's Urgent Care by Dr. Jeffrey Smith for multiple contusions, strains and cervical radiculopathy. Plaintiff continued treating with Dr. Smith on January 18 and January 24, 2001 for this injury.
3. Dr. Chock Tsering first treated plaintiff on July 10, 2001. Plaintiff reported to Dr. Tsering that he lost consciousness when he fell after the step broke on his truck. Dr. Tsering diagnosed plaintiff with radiculopathy at C8; post-concussive syndrome with headaches, cognitive and memory impairment, concentration difficulty and mood disorder, and myofascial pain. Dr. Tsering indicated that plaintiff would not be fit for any type of work due to his pain, cognitive impairment and mood disorder. Dr. Tsering continued to treat plaintiff through 2001 *Page 5 
and 2002, keeping plaintiff out of work and indicating that plaintiff was totally disabled from gainful employment due to his cognitive impairment.
4. Dr. Tsering continued to treat plaintiff in 2003 and last saw plaintiff on August 23, 2004 during which time his diagnosis of plaintiff and his opinion that plaintiff was unable to return to any type of gainful employment remained the same.
5. Dr. Conder is board-certified in neuropsychology and rehabilitation psychology. He initially evaluated plaintiff on December 6, 2001. Based upon plaintiff's MMPI and overall presentation, Dr. Conder testified that it seemed like plaintiff was using his symptoms to avoid dealing with things or using his symptoms to get relief from certain things such as going to work or having to deal with any psychological problems plaintiff might have that were unrelated to any physical problems he had. He also warned against the use of Lortab for long-term pain management, which is the medication plaintiff had been prescribed by Dr. Tsering.
6. In 2002 and 2003, while receiving temporary total disability benefits from defendants and without its knowledge, plaintiff drove a truck for another employer, M S Solomon Trucking. Plaintiff first worked for M S Solomon Trucking on February 24, 2002. The paychecks for this work were sent directly to him and the 1099 forms indicate plaintiff was paid $2,995.00 in 2002 and $236.00 in 2003.
7. Dr. Conder evaluated plaintiff again on January 21, 2003 at which time plaintiff was still taking Lortab and Soma. Dr. Conder administered the MMPI again and opined plaintiff's results were consistent with someone who had multiple somatic complaints with a possibility of clear secondary gain such as someone receiving workers' compensation benefits who may not want to go back to work. Dr. Conder also noted plaintiff's results actually argued *Page 6 
against there being a head injury because of the inconsistency in the patterns and what is known about research studies of improvement over time.
8. On April 7, 2003, while still under the care of Dr. Tsering, who had written plaintiff out of work and had prescribed plaintiff narcotic medications, plaintiff underwent a DOT medical exam with Dr. Smith at Doctor's Urgent Care. At the hearing before the Deputy Commissioner, plaintiff admitted that during the examination he denied any illness or injury within the past five years, any head or brain injury, any nervous or psychiatric disorder, any loss of or altered consciousness, any spinal injury or disease, any chronic back pain, or any required usage of narcotic or habit forming drugs which would affect his ability to drive a commercial vehicle in a safe manner. Plaintiff signed the form verifying he had given accurate information to the physician. Plaintiff testified that he did not believe any of the conditions he had would prevent him from operating a truck safely. He also noted that he had not wanted to give up his commercial driver's license (CDL) as he did not think he would be able to obtain one again.
9. Dr. Smith testified that plaintiff's misrepresentations made during the DOT exam allowed plaintiff to obtain the DOT certification that otherwise he might not have gotten. He indicated that had he known plaintiff was treating with another physician, namely Dr. Tsering, he would have withheld DOT certification until a letter of clearance was obtained from the other physician.
10. Having successfully obtained DOT certification by not disclosing his back injury to Dr. Smith, plaintiff entered into Independent Contractor Operating Agreements with Baker Transport on July 16, 2003, August 16, 2003, September 16, 2003, and October 16, 2003. Plaintiff contends that he signed these Agreements on behalf of Heavy D Hauling, for whom plaintiff alleges he has power of attorney to contract work. Plaintiff testified that he drove a *Page 7 
pick-up truck for Heavy D Hauling which had contracted with Baker Transport. Payments for his work with Baker Transport were sent to Heavy D Hauling. Plaintiff's driver's logs while he was driving for Baker Transport indicate plaintiff drove extensively and from coast-to-coast. He drove from as little as 3 hours to as much as 10 to 12 hours in a day. In the third quarter of 2003, the time frame constituting the majority of time plaintiff drove for Baker Transport, plaintiff reported driving 24,008 miles.
11. In her deposition, Delane Baker testified that she is the Vice President of Black Tree Limited, d/b/a Baker Transport. She testified plaintiff worked as an owner-operator driving a one-ton truck pulling a three-car carrier, which is a trailer about 50 feet long. She stated that plaintiff held himself out as being a partner in Heavy D Hauling. No one except plaintiff ever drove the truck because no one else at Heavy D Hauling was qualified as a driver under DOT regulations. Ms. Baker classified the work plaintiff did as at least in the medium physical demand level in that it involved quite a bit of physical activity including lifting the trailer ramps that weighed approximately 90 pounds. Ms. Baker testified that plaintiff presented a valid medical certificate at the time he was hired and she was not aware that plaintiff had represented to others that he had any health conditions that would limit his ability to operate a truck safely.
12. Also during this time period, plaintiff performed work 1 to 2 days per month for Samet Corporation through Heavy D Hauling. This work did not involve driving any loads but involved advising Gary Bridges based on plaintiff's experience in the trucking industry.
13. During the time that plaintiff was treating with Dr. Tsering and continuing to complain of pain and cognitive difficulties, plaintiff worked on a carport project for Mr. Daniel Francis and his aunt. Mr. Francis testified that $6,000.00 was transferred through SunTrust on May 13, 2003 and $5,900.00 was transferred through Wachovia Bank on July 21, 2003 into an *Page 8 
account in the names Larry Glynn and Katherine Leath. Mr. Francis observed plaintiff performing work at his house and took photographs of plaintiff performing work.
14. Katherine Leath, plaintiff's wife, is self-employed as the president/owner of Leath Trucking. She filed Articles of Incorporation in October 2003. Although she is the president/owner of the company, Ms. Leath testified plaintiff advises the company because she does not have any knowledge of the trucking industry. Since October 2003, plaintiff has driven for Leath Trucking occasionally when necessary, and he has road tested with drivers needing more experience. However, plaintiff could not list the number or names of the drivers employed by Leath Trucking, Inc.
15. Plaintiff did not advise his doctors of any of the work that he was doing during 2002 and 2003.
16. On November 21, 2003, plaintiff executed a compromise settlement agreement in this matter in the presence of his former attorney alleging that he was permanently and totally disabled as a result of the injury which is the subject of this claim. The agreement provided for plaintiff to receive a lump sum of $100,000.00 as a result of the settlement of his claim.
17. During his deposition, Dr. Conder was presented with information that from mid-July 2003 to mid-October 2003 plaintiff was employed as a truck driver in which he drove cross-country, fueled the truck, submitted fuel receipts, and completed a drivers' log but not did disclose his work and continued to complain to Dr. Tsering that he was permanently and totally disabled. Dr. Conder stated that these actions corresponded to the results of his evaluations of plaintiff. He opined that in situations involving head injuries and subjective complaints of pain, if the person is not truthful with medical providers, it is very difficult, if not impossible, to have a valid diagnosis. Dr. Conder testified there were a lot of red flags during his evaluation of *Page 9 
plaintiff based on the objective testing and on his own clinical intuition. He did not feel plaintiff was giving a good-faith effort and he also felt that there was symptom exaggeration and secondary gain. He agreed plaintiff was capable of gainful employment from a cognitive standpoint if he was able to hold down a cross-country truck-driving job in which he had to submit drivers' logs, keep track of things, and drive in unfamiliar places.
18. In his deposition, Dr. Tsering noted that the practice of medicine was based on the fact that unless there was an overt reason not to believe what a patient says, then it is assumed that the patient is saying what was actually experienced and he agreed that if the patient was untruthful, the diagnosis would be affected. Dr. Tsering indicated that if it was documented that plaintiff drove inter-state, over long distances, in a responsible manner, as part of an employment contract, and that he kept his gas receipts and driver's log, then that showed plaintiff was not as disabled as he had claimed to be or as disabled as Dr. Tsering had perceived him to be. Dr. Tsering also agreed that his perception of plaintiff was wrong, not because he had made a mistake but because he was deceived by plaintiff. Dr. Tsering also stated that it was reasonable to assume that if plaintiff was gainfully employed then he was able to run a business of any kind that would sustain living.
19. Susan Huffine-Athanasopoulos, the claims supervisor and former claims adjuster on this claim, testified that plaintiff had received $51,742.66 in indemnity benefits and $46,053.89 in medical benefits as of the date of hearing before the deputy commissioner. She also testified that approximately $28,652.39 had been paid in legal fees regarding this matter, but this figure did not include the cost of surveillance or other costs.
20. From February 2002 through the date of the hearing before the Deputy Commissioner, defendants paid $32,477.11 in indemnity payments, $38,081.02 in medical *Page 10 
payments, and incurred $25,153.64 in attorneys' fees. Defendants incurred an additional $19,232.00 in attorneys' fees since the date of the hearing before the deputy commissioner.
21. The indemnity checks endorsed by plaintiff contain the following sentences:
 If this draft is for temporary total, temporary partial, or permanent total disability benefits, you must advise your employer and the insurer of any other earnings you are receiving or work activity you are engaged in while receiving these benefits. Failure to do so may result in criminal liability.
22. The undersigned have reviewed all of the medical and other evidence presented and find that the opinions of Dr. Smith, Dr. Tsering and Dr. Conder are credible.
23. The Full Commission finds that plaintiff made misrepresentations of material fact to his health care providers as well as to defendants. He failed to inform defendants that he possessed wage-earning capacity and that he had, in fact, earned wages while continuing to receive temporary total disability benefits. He also failed to report his activities to his treating physician, Dr. Tsering, which led Dr. Tsering to continue to maintain plaintiff was permanently and totally disabled and prescribe narcotic medications even while plaintiff was earning wages driving a truck across the country on a regular basis. At the same time, plaintiff failed to report his previous injury, his continuing treatment, and his use of DOT-prohibited medications to Dr. Smith in order to obtain his DOT certification so he could work for Baker Transport. These representations were made under circumstances such that plaintiff would have known that they were false. These misrepresentations were fraudulent in nature and they induced defendants to continue paying indemnity and medical benefits and enter into a compromise settlement agreement with plaintiff. Consequently, there was error due to fraud and misrepresentation which led to payment of workers' compensation benefits and led defendants to enter into a compromise settlement agreement. *Page 11 
23. Plaintiff regained wage earning capacity in February 2002 when he began working for M S Solomon Trucking.
24. Plaintiff willfully made false statements and representations of material fact for the purpose of obtaining workers' compensation benefits.
25. Plaintiff defended this claim without reasonable ground.
 **********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Pursuant to N.C. Gen. Stat. § 97-17(a), the Commission may set aside an approved compromise settlement agreement when a party is able to show to the satisfaction of the Commission that there has been error due to fraud, misrepresentation, undue influence or mutual mistake. N.C. Gen. Stat. § 97-17(a). In the case at hand, defendants have shown that it entered into the compromise settlement agreement that was executed by plaintiff on November 21, 2003 and approved by the Industrial Commission on December 2, 2003 under the misrepresentations made by plaintiff as enumerated above. As such, the compromise settlement agreement approved by the Industrial Commission on December 2, 2003 is hereby set-aside.
2. In McGee v. Estes Exp. Lines, 125 N.C. App. 298, 480 S.E.2d 416
(1997), the Court of Appeals stated that it was an employee's earning capacity, rather than his earnings, which is the determining factor on the issue of disability. Id., 125 N.C. App. At 300, 480 S.E.2d at 418. The evidence in this case shows plaintiff regained his earning capacity on February 25, 2002, when he first began working as a truck driver for M S Solomon Trucking. Plaintiff has *Page 12 
failed to show through credible testimony or evidence that he is disabled and as such is not entitled to further indemnity benefits.
3. The evidence shows plaintiff was working as early as February 24, 2002 while his treating physician was continuing to keep plaintiff out of work due to plaintiff's complaints of pain and cognitive difficulties. It is unknown whether any medical treatment plaintiff received after February 24, 2002 was necessary to effect a cure or give relief. As such, defendants have no further responsibility to pay for medical treatment related to the compensable injury. N.C. Gen. Stat. § 97-25.
4. The Industrial Commission has the authority to assess a civil penalty and to order restitution. Specifically, the Industrial Commission shall assess and collect civil penalties and restitution from any person who willfully makes a false statement or representation of a material fact for the purpose of obtaining any benefit or payment under the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-88.2.
5. By working and earning wages while receiving indemnity and medical benefits and without notifying the defendants or his treating physician of this fact, plaintiff has willfully made false statements and representations of material fact for the purpose of obtaining benefit or payment under the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-88.2. As such defendants are entitled to restitution for the amount of indemnity and medical benefits paid to plaintiff since February 2002 in the amount of $70,528.13. Further, plaintiff shall be assessed a civil penalty in the amount of $1,000.00. N.C. Gen. Stat. § 97-88.2.
6. Plaintiff defended this action without reasonable grounds and, therefore, plaintiff is assessed the whole cost of the proceedings, including attorneys' fees incurred by defendants' since February 24, 2002, which amount to $44,385.64, and costs incurred by defendants since *Page 13 
February 24, 2002 pursuant to N.C. Gen. Stat. § 97-88.1. Sparks v.Mountain Breeze Restaurant, 55 N.C. App. 663, 286 S.E.2d 575 (1982).
 **********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enter the following:
 ORDER
1. The previously approved compromise settlement agreement is hereby SET ASIDE due to fraud and misrepresentation.
2. Plaintiff is not entitled to further indemnity or medical benefits.
3. Plaintiff shall make restitution in the amount of $70,528.13 to defendant-carrier.
4. A civil penalty in the amount of $1,000.00 is assessed against plaintiff for willfully making false statements and representations of material fact for the purpose of obtaining benefit and payment under the Workers' Compensation Act. Plaintiff shall pay the penalty by making payment to the "North Carolina Industrial Commission" and forwarding the payment to Ms. Carolyn Wall at the Industrial Commission's Raleigh address.
5. Plaintiff shall pay the entire costs of these proceedings, including the attorneys' fees incurred by defendants since February 24, 2002 in the amount of $44,385.64 and costs incurred by defendants since February 24, 2002.
This the 22nd day of June 2007.
S/______________________ DIANNE C. SELLERS COMMISSIONER
 CONCURRING: *Page 14 
S/______________________ BERNADINE S. BALLANCE COMMISSIONER
 S/______________________ DANNY LEE McDONALD COMMISSIONER *Page 1